IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 1, 2017



# IN RE ANGEL M.[1], ET AL.

## Appeal from the Circuit Court for Sevier County
### No. 12C465       William B. Acree, Sr. Judge[2]

_____

## No. E2016-02061-COA-R3-PT

_____

This appeal involves the termination of the parental rights of the mother and father of two minor children. The trial court held that the parents were in substantial noncompliance with three permanency plans, primarily for drug abuse and the failure to seek treatment, and subsequently terminated the parental rights of each. Both parents appeal. We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded

**JOHN W. MCCLARTY, J.,** delivered the opinion of the court, in which **FRANK G. CLEMENT, JR., P.J., M.S.,** and **BRANDON O. GIBSON, J.,** joined.

**Robert L. Huddleston, Maryville, Tennessee, for the appellant, Aaron T.**

**Gregory E. Bennett, Seymour, Tennessee, for the appellant, Nancy M.**

**Herbert H. Slatery, III, Attorney General & Reporter, and William Derek Green, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.**

**Wendy Gooch Patrick, Guardian ad Litem for the minor children.**

---

[1]In cases involving termination of parental rights, it is the policy of this court to remove the last names of minor children and other parties in order to protect their identities.
[2]Sitting by designation of the Tennessee Supreme Court.

**OPINION**

**I. BACKGROUND**

Angel Rose M. ("ARM") and Dameon Michaels T. ("DMT" and collectively, "the Children") were born out of wedlock to Nancy M. ("Mother") and Aaron T. ("Father" and collectively, "the Parents") in September 2010 and August 2012, respectively. Father was not listed on ARM's birth certificate, but Father held himself out to the community as her father and, for all intents and purposes, is the putative father.[3] Mother related at trial that Jeremy M., her ex-husband, was ARM's legal father because she was married to him at the time of the child's birth, but his whereabouts are unknown.

In October 2013, the Tennessee Department of Children's Services ("DCS") removed the Children from the Parents' custody after filing a Petition to Transfer Temporary Legal Custody and a subsequent agreement entered by the Jefferson County Juvenile Court. The agreement placed the Children in the custody of two relatives, Brandon and Latashia B., relatives of Mother. DCS originally sought custody because of significant drug abuse by the Parents and environmental concerns in the Parents' shared home. Tenn. Code Ann. § 37-1-102(b)(1) and (12). On January 21, 2014, the Jefferson County Juvenile Court issued an order in which the Parents waived an adjudicatory hearing and subsequently stipulated "that the facts alleged in the [Petition to Transfer Temporary Legal Custody], which are hereby specifically incorporated by reference, are true." According to the petition, Mother tested positive for opiates and Oxycodone on the day of the removal, and Father tested positive for THC, opiates, and Oxycodone. The facts of the petition further alleged severe environmental abuse occurring in the Parents' home when DCS workers visited. The petition also contained allegations about the Parents' drug usage, including admissions by Mother and Father. In April 2014, with the Children in the custody of the maternal relatives, however, the case was closed. The Jefferson County Juvenile Court noted that the Parents had failed to complete drug treatment, brought other individuals to visitations with the Children, and made inappropriate and threatening comments to the custodians. The Parents were granted limited visitation rights at neutral locations.

In January 2015, approximately nine months later, the maternal relatives voluntarily relinquished custody of the Children because of the Parents' confrontational and harassing behavior toward the relatives and "concerning behaviors" exhibited by the Children that the relatives could not manage. Both the Children appeared to be developmentally challenged, and DMT revealed signs of autism, despite not having been diagnosed. DCS filed a Petition for Temporary Legal Custody on January 21, 2015, and the Sevier County Juvenile Court granted DCS custody of the Children. On the same day,

---

[3]Father was declared ARM's father on February 11, 2015 at a hearing in Sevier County Juvenile Court: "Aaron T[] is legitimated as the father of Angel Rose M[]."

both the Parents tested positive for marijuana, Mother tested positive for Suboxone, and Father tested positive for Buprenorphine and Benzodiazepines ("Benzos"). On April 22, 2015, after holding a hearing where the Parents and counsel were present, the juvenile court adjudicated the Children as dependent and neglected pursuant to Tennessee Code Annotated section 37-1-102(b). In the order resulting from that hearing, the Parents stipulated that the Children's removal was due to the Parents' substance abuse history.

During the progression of this case, the Parents' drug test results were as follows:

Mother –
January 22, 2015: marijuana, Suboxone;
February 11, 2015: Negative;
March 24, 2015: Oxycodone (Mother had a prescription);
June 16, 2015: Negative;
October 15, 2015: Suboxone; Oxycodone;
November 3, 2015: Negative;
January 27, 2016: Suboxone;
February 5, 2016: Suboxone;
March 14, 2016: Suboxone;
April 14, 2016: Oxycodone (Mother had doctor's note saying she had prescription).
August 15, 2016: Negative.

Father –
January 22, 2015: Benzos, marijuana, Suboxone
February 11, 2015: Oxycodone, marijuana;
March 24, 2015: Opiates, Oxycodone, marijuana
June 16, 2015: marijuana, Suboxone;
December 10, 2015: Suboxone, Oxycodone, marijuana
January 27, 2016: Negative;
April 14, 2016: Suboxone, cocaine, marijuana;
August 15, 2016: Cocaine.

DCS developed the first of three permanency plans for the Parents and the Children on April 8, 2015. All three plans required the Parents to complete alcohol and drug ("A&D") assessments, follow all recommendations for treatment, provide proof thereof, and sign a release of information for DCS; and maintain employment and provide proof thereof. The plans also required each parent to pay child support in the amount of $50 each child per month. The Sevier County court ratified the first plan on April 22, 2015. It included the goal of "Return to Parent" for the Parents. They both had signed a Criteria and Procedure for Termination of Parental Rights on March 24, 2015, indicating that they had received a copy of the form and had been given an explanation of its contents.

The second plan, dated October 26, 2015, added the additional requirements that the Parents provide random urine screens and participate in supervised visitation. It also listed the goals of "Return to Parent" and "Adoption."[4] The juvenile court ratified the second plan on December 9, 2015. The case worker had offered to meet Mother at DCS' offices to review and sign the permanency plan on October 9 and 15, 2015, but Mother failed to appear on both dates. The case worker made the same offer to Father to review and sign the second permanency plan on October 6 and 15, 2015. He, likewise, did not appear on either date.

At the permanency hearing on December 9, 2015, the juvenile court found the Parents were not in substantial compliance with the original parenting plan. It determined that the Parents had neither completed A&D assessments nor provided proof of obtaining them; also, they had visited inconsistently. They had only met their obligations to obtain appropriate employment.

DCS developed the third plan on February 5, 2016. This plan added several requirements while including all previous ones from the earlier plans. The new requirements required Mother to undergo a mental health assessment, follow all recommendations resulting from it, and turn in required documentation as proof to DCS. The plan further required: the Parents shall pay child support as ordered; they shall provide the number of any new phones they acquire to DCS; they shall provide documentation of their completion of parenting classes; and the Parents shall return DCS' calls and text messages. The third parenting plan removed "Return to Parent" as a goal, leaving only "Adoption."[5] It was ratified by the juvenile court on May 11, 2016.

Earlier in the year, Father pled guilty to two counts of assault in Jefferson County and was sentenced to eleven months and twenty-nine days of supervised probation. On January 29, 2016, Father was found in contempt of court for failing to pay child support toward ARM. In May 2016, Father was again arrested for failing to pay child support, having been found in contempt of court earlier in the month regarding the arrearage. During the arrest, Father possessed Suboxone, and he later pled guilty to possession of drug paraphernalia and a Schedule III substance.

On March 7, 2016, DCS filed a Petition to Terminate Parental Rights in the Sevier County Circuit Court instead of the juvenile court. The petition argued two grounds for termination: Father's abandonment for failure to provide child support and the Parents' substantial noncompliance with the first and second permanency plans. On the latter ground, DCS submitted as proof the Parents' many recent failed drug tests and failure to complete the A&D assessments and receive subsequent treatment (Father completed one

---

[4]Both the Parents objected to the goal of adoption.
[5]The Parents, again, did not agree with the goal of adoption.

- 4 -

assessment, but never followed up with treatment; Mother did not complete an assessment). DCS argued these facts constituted substantial noncompliance with the permanency plans. Further, DCS alleged that the Parents had largely ceased communicating with their case worker. Accordingly, DCS argued that termination of parental rights was in the best interest of the Children.

DCS filed a motion to amend its original petition to terminate on June 1, 2016. DCS requested that the new requirements in the third permanency plan (ratified by the juvenile court on May 11, 2016) be included in the petition as additional grounds by which DCS alleged the Parents were not in compliance. These additional requirements included: Mother will complete a mental health assessment, follow recommendations from the assessment, and provide proof of such to DCS; the Parents will provide random urine screens to DCS when requested; the Parents will pay child support as ordered and will be caught up with the amount owed; the Parents will inform their case worker each time he or she gets a new telephone number and the Parents will return DCS' phone calls and text messages; and the Parents will provide documentation to DCS that they have completed their parenting classes. Despite all parties and counsel being properly served notice of this motion, it was not addressed until the day of the trial on August 25, 2016.

On August 23, 2016, two days before trial, Father moved for a continuance, arguing that DCS' intent was to have its motion to amend heard and granted on the same day of trial, thus resulting in a "trial by ambush." The result, Father alleged, would be the Parents inability to know and defend against the charges alleged against them. Further, Father argued that he should be allowed fifteen days to file a responsive pleading under Rule 15.01 of the Tennessee Rules of Civil Procedure if DCS' motion to amend was granted.

On August 25, 2016, arguments were heard on both motions. The trial court granted DCS' motion to amend and denied Father's motion to continue. Specifically, the court declared that "there has been adequate time to prepare for [the motion to amend and the new allegations in it] . . . so the Motion to Continue is denied." The trial proceeded with substantial testimony being given by Father, Mother, various DCS employees who had worked on the case, and the Children's foster mother.

Maureen DiRoma, the first case worker assigned to the Parents' case from January 2015 until April 2016, testified that she had discussed the requirements of the permanency plans with the Parents and their attorneys, invited them to meetings about the plans, and sent them copies of the plans by mail. She further related that she had gone over the Criteria and Procedures for Termination of Parental Rights document and explained the consequences of failing to comply with the plans. Ms. DiRoma recalled that Mother was involved in the development of all three plans, the latter two by phone. Father was only involved in the first plan, but Ms. DiRoma made efforts to involve him.

Ms. DiRoma related that the Parents' contact with her and DCS was "inconsistent." She testified that the Parents often canceled or failed to show up for scheduled meetings and home visits. The Parents were recalcitrant about taking drug tests, and when they did, they consistently failed. Ms. DiRoma testified that around October 2015, Mother told her that she had taken an A&D assessment, but the proof was never provided to the case worker. Ms. DiRoma, the DCS employee responsible for filing the March 2016 petition to terminate the Parents' parental rights, stated that she filed the petition largely out of concern for the Parents' continued substance abuse problems and repeated failed drug screens.

Brent Ward took over the Parents' case at the end of April 2016. He testified that the Parents' contact with him was "sporadic" and that their phones were "[u]sually . . . turned off." Mr. Ward left messages at Mother's place of employment and on Father's phone, but generally, his calls were not returned. During a home visit in May 2016 at which Mother alone was present, he encouraged her to complete an A&D assessment. On occasions when Mr. Ward did make contact with the Parents, they consistently told him that they had completed the assessments, were participating in treatment, and would send him proof. No such proof, however, was ever forthcoming.

Mr. Ward testified that he spoke with Mother by phone in June 2016, at which time she promised to bring copies of the Parents' A&D and parenting class documentation the following Monday and take a drug test. She failed to do either. During the same month, Mother sent him a text message stating that she was attending parenting classes at Helen Ross McNabb Center and receiving A&D treatment through Cherokee Health in Knoxville, Tennessee. Mr. Ward related that he "lost communications" with the Parents during July 2016, being unable to reach them by phone despite multiple calls, including to Mother's place of employment. When Mr. Ward reestablished contact with Mother on August 2, 2016, she agreed to meet the same day for a drug screen, but never showed up or called to cancel. Mr. Ward subsequently drove to the Parents' home and found no one present. The Parents later told Mr. Ward that they had left their home to avoid encountering law enforcement in order that they could continue working on their plan requirements.

Sarah Schenk, a worker at Smoky Mountain Children's Home, testified that her employer had contracted with DCS to set up visitations for the Parents. Like the DCS caseworkers, she recalled that she had difficulty communicating with the Parents. Specifically, Ms. Schenk testified that she had to communicate with Mother through a mobile phone "app" because Mother did not have an active cell phone number. Ms. Schenk stated that she never received a phone number for Father. Mr. Ward recalled that the Parents' visitation was inconsistent at best, with the Parents visiting twice in May 2016, once in June 2016, and once in August 2016. Ms. Schenk stated that she reached out to schedule a visit for July, but she was unable to do so by the time Mother finally responded to her inquiries.

- 6 -

On the day of trial, the Parents brought documentation showing the completion of a single parenting class at Helen Ross McNabb two days prior to trial. Ms. DiRoma testified that Father had completed an A&D assessment in his home, but that he did not complete required follow up treatment. Mother did not obtain an A&D assessment except for one she completed in 2013 for the prior case in Jefferson County. Ms. DiRoma noted that she informed Mother the outdated A&D assessment would not be acceptable. The testimony is unclear whether Ms. DiRoma explicitly told Mother that DCS would pay for the services if Mother could not afford them, but the record reflects Mother was aware that her insurance (TennCare) should cover the A&D services and that she could let DCS know if she had any issues.

Mother maintained, however, that she could not find any service providers in Sevier County that accepted her insurance. She stated that on an undisclosed day, a health worker, at the behest of DCS, came out to the home and performed an A&D assessment on Father, but refused to do one for her because of her insurance. Mother admitted, however, that she knew DCS would help her find services, but that she did not tell Mr. Ward or Ms. DiRoma of her need for assistance. In fact, Mother acknowledged that she frequently told Mr. Ward that she and Father were working on their classes, had completed A&D assessments, and were in treatment. Under oath, Mother admitted that she lied to Mr. Ward when she told him that she and Father had received assessments, were in treatment, and were taking parenting classes. She further related that she would complete her A&D assessment the day after trial.

On September 29, 2016, the trial court terminated the parental rights of both the Parents to the Children. Despite finding that DCS had not proven by clear and convincing evidence that Father had abandoned the Children for failure to provide child support,[6] the court concluded that DCS had proven by clear and convincing evidence that both the Parents were in substantial noncompliance with the permanency plans under Tennessee Code Annotated section 36-1-113(g). The trial court first found the plans' requirements to be reasonable and related to remedying the conditions that first led to the Children's removal, most importantly, the history of drug use by the Parents. The court also found that the Parents' noncompliance was substantial in light of the importance of the particular requirement that has not been met and the degree of noncompliance, especially noncompliance with drug-related requirements.

For the first plan, the requirements included maintaining employment, which the court found the Parents met, and undergoing an A&D assessment and following recommendations. Mother did not comply at all with the A&D requirement. Father underwent an A&D assessment, but did not complete recommendations.

---

[6]This issue is not raised on appeal.

For the second plan, Father and Mother had the same compliance and noncompliance for employment and the A&D assessment, respectively. The trial court found that the Parents had complied with the supervised visitation requirements. While the trial court did not mention it, the court found that the Parents complied with drug screening requirements in the third plan, and we assume the court meant the same as were required in the second plan, as noted in the record.

For the third plan, the Parents had the same compliance and noncompliance for employment, the A&D assessment, visitation, and drug screening. The trial court found that Father did not comply with the child support requirement in the third plan, but it noted that the issue had already been covered in the first ground for termination. The court determined compliance with the requirement that the Parents provide new telephone numbers to DCS because no new numbers had been acquired. The court found noncompliance with the requirement of taking parenting classes and providing proof, determining that one class taken two days prior to trial was not sufficient. Also the court concluded noncompliance with the mental health requirement for Mother. However, the trial court focused primarily on the failure to complete the A&D assessment requirements in all of the plans as the basis for finding substantial noncompliance by both the Parents for all three parenting plans. The court noted that "rather than going through some type of treatment processes as required by DCS, the parents continued to use drugs."

The trial court next considered the multiple factors under Tennessee Code Annotated section 36-1-113(i) to determine if terminating parental rights is in the Children's best interest. The court determined that by clear and convincing evidence termination of parental rights was in the Children's best interest. Factors (1), (4), (5), (7), and (8) weighed significantly in favor of the position of DCS. This timely appeal followed.

## II. ISSUES

We have consolidated the issues raised by the Parents on appeal as follows:

> (1) Whether the trial court erred in granting leave to amend the Petition to Terminate Parental Rights on the morning of the trial?

> (2) Whether the trial court erred by allowing the Petition to Transfer Temporary Legal Custody into evidence?

> (3) Whether the trial court erred in holding that the Parents were in substantial noncompliance with the permanency plans?

- 8 -

(4) Whether the trial court erred in finding that termination of the Parents' parental rights was in the Children's best interest?

## III. STANDARD OF REVIEW

A trial court's decision to grant or deny a motion to amend pleadings may only be overturned upon a showing of an abuse of discretion. *Smith v. King's Daughters and Sons Home,* No. W2015–00435–COA–R3–CV, 2015 WL 8730834, at *5 (Tenn. Ct. App. 2015) (citing *Pratcher v. Methodist Healthcare Memphis Hosps.*, 407 S.W.3d 727, 741 (Tenn. 2013)).

The decision to admit or exclude evidence "is within the discretion of the trial court and will not be reversed absent a clear showing of an abuse of discretion." *Watson v. City of Jackson*, No. W2013-01364-COA-R3-CV, 2014 WL 4202466, at *5 (Tenn. Ct. App. Aug. 26, 2014) (quoting *State v. McCray*, 922 S.W.2d 511, 515 (Tenn. 1996)).

As we recently discussed regarding parental termination in *In re Yariel S.*,

> Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(l)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 136 L. Ed. 2d 473 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).
>
> While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. See *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re*

*Drinnon*, 776 S.W.2d at 97.

No. E2016-00937-COA-R3-PT, 2017 WL 65469, at *3 (Tenn. Ct. App. Jan. 6, 2017). In Tennessee, a parent's rights may only be extinguished upon:

> (1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
>
> (2) [t]hat termination of the parent's or guardian's rights is in the best interest [] of the child.

Tenn. Code Ann. § 36-1-113(c) (2017).

As we further elaborated in *In re Yariel S.*:

> "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).
>
> The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App.

- 10 -

2001); *In re C.W.W.*, 37 S.W.3d at 474.

*Id.*

Our Supreme Court most recently provided guidance on the appropriate standard of review in parental rights termination cases in *In re Carrington H.*:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

483 S.W.3d 507, 524 (Tenn. 2016) (internal citations omitted).

## IV. DISCUSSION

### A. Motion to Amend

Under the Tennessee Rules of Civil Procedure,

> A party may amend the party's pleadings once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been set for trial, the party may so amend it at any time within fifteen (15) days after it is served. *Otherwise a party may amend the party's pleadings only by written consent of the adverse party or by leave of*

*court; and leave shall be freely given when justice so requires*. . . . A party shall plead in response to an amended pleading within the time remaining for response to the original pleading or within fifteen (15) days after service of the amended pleading, whichever period may be longer, *unless the court otherwise orders*.

Tenn. R. Civ. P. 15.01 (emphasis added).

"Trial courts have broad authority to decide motions to amend pleadings and will not be reversed absent an abuse of discretion." *Smith*, 2015 WL 8730834, at *5 (citing *Pratcher*, 407 S.W.3d at 741). A trial court abuses its discretion by "(1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Eagle CDI, Inc. v. Orr*, No. E2016-01399-COA-R3-CV, 2017 WL 2350156, at *4 (Tenn. Ct. App. May 31, 2017) (citing *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)).

"The Rules put forth a liberal policy of permitting amendments in order to ensure determination of claims on their merits." *Henderson v. Bush Bros. & Co.*, 868 S.W.2d 236, 237 (Tenn. 1993). "Trial courts must give the proponent of a motion to amend a full chance to be heard on the motion and must consider the motion in light of the amendment policy embodied in Rule 15.01 of the Tennessee Rules of Civil Procedure that amendments must be freely allowed; and, in the event the motion to amend is denied, the trial court must give a reasoned explanation for its action." *Cumulus Broad., Inc. v. Shim*, 226 S.W.3d 366, 374–75 (Tenn. 2007) (citing *Henderson*, 868 S.W.2d at 237).

Under an abuse of discretion standard, we cannot substitute our judgment for that of the trial court. *Pratcher*, 407 S.W.3d at 741 (citing *Williams v. Baptist Mem'l Hosp.*, 193 S.W.3d 545, 551 (Tenn. 2006)). Tennessee trial courts are guided by many factors in determining whether to permit or deny a late-filed amendment. *Id.* These factors include undue delay in filing; lack of notice to the opposing party; bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment. *Cumulus Broad., Inc.*, 226 S.W.3d at 374; *Pratcher*, 407 S.W.3d at 741 (citing *Merriman v. Smith*, 599 S.W.2d 548, 559 (Tenn. Ct. App. 1979)).

Father argues that DCS' motion to amend was an attempt to "piggyback" the more onerous requirements of the third permanency plan onto the Petition to Terminate Parental Rights because DCS' case was too weak under the original petition; that DCS and the trial court relied heavily on these new requirements to terminate the Parents' parental rights; and that DCS intentionally waited to prosecute its motion until the date of the trial to cause "trial by ambush," thus giving the Parents no time to prepare a defense for the new allegations in the newly amended petition, despite the fact that the motion to

amend was properly served to the Parents' counsel in June 2016. Father contends that this caused undue prejudice to him, violating his Due Process rights guaranteed under the Fifth and Fourteenth Amendments of the United States Constitution and Article I, sections eight and seventeen of the Tennessee Constitution. Father also asserts that the trial court did not clearly grant the motion to amend, and only denied the motion to continue, and did not provide a reason for doing so. Father also argues that he should have been given 15 days to file a responsive pleading, pursuant to Rule 15.01.

DCS responds that the trial court has discretion to grant or deny a motion at any time in the proceeding and that courts are only required to explain their rulings when a motion to amend is denied. Further, DCS contends that there has been no undue delay because the motion to amend was filed almost three months prior to trial. Additionally, DCS cites *In re A.W.* to support its position that the Parents were not excused from the conditions of a permanency plan pending its ratification by the juvenile court when they "do not argue that [they] were unaware of the conditions placed on [them] or that [they] thought the plans had lapsed . . . [and were] at all times represented by counsel, and . . . did not object to the continuing applicability of the plans." 114 S.W.3d 541, 546 (Tenn. Ct. App. 2003). The record is clear that the Parents understood the plan requirements and were represented by counsel, even if they disagreed with the goal of adoption, and they did not object to the applicability of the plans.

The third permanency plan was ratified on May 11, 2016. DCS filed its motion to amend on June 1, 2016, approximately two months after its initial petition and approximately three weeks after ratification of the third permanency plan. Having reviewed the record, we find no abuse of discretion in granting the motion to amend.

### B. Admissibility of Evidence

Father argues that the admission of Exhibit 23, DCS' Petition to Transfer Temporary Legal Custody from the initial custody event in Jefferson County in October 2013, was highly prejudicial because it referred to the Parents' serious past drug abuse, and environmental concerns in their home, was not properly authenticated, and was inadmissible as hearsay because it was based on DCS' workers statements regarding the Parents and their home and the Parents' own statements. DCS, alternatively, asserts that Exhibit 23 was not *unfairly* prejudicial under Rule 403 of the Tennessee Rules of Evidence. DCS contends that the petition is admissible under the hearsay exception for admissions by an opposing party because the Parents stipulated to the facts alleged in the petition as true in the first dependency and neglect proceeding in January 2014. Lastly, DCS argues that even if the petition's admission was error on the part of the trial court, it was not reversible error because the document merely provided context and the court relied far more heavily on other evidence to arrive at its determination.

The admission or exclusion of evidence is within the trial court's sound discretion.

*In re Melanie T.*, 352 S.W.3d 687, 698 (Tenn. Ct. App. 2011) (citing *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 222 (Tenn. Ct. App. 2002)). "Although the discretionary nature of the decision does not shield it completely from appellate review, it does result in less rigorous appellate scrutiny." *Id.* (citations omitted). "When the trial court's discretionary decision involves a choice among acceptable alternatives, the appellate court may not second-guess the trial court's exercise of its discretion merely because 'the trial court chose an alternative the appellate courts would not have chosen.'" *Id.* at 698 (citations omitted).

However, even if a trial court commits error in admitting or excluding evidence, "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected . . . ." Tenn. R. Evid. 103(a); *In re Melanie T.*, 352 S.W.3d at 687. An error is substantial, or not harmless, "if the trial court's error would have more probably than not affected the judgment or would result in prejudice to the judicial process." *Morgan v. Superior Catering Servs.*, No. E2014-00005-COA-R3-CV, 2015 WL 1594011, at *11 (Tenn. Ct. App. April 7, 2015); *see also* Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process").

## 1. Hearsay/Authenticity

The Tennessee Rules of Evidence define hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence *to prove the truth of the matter asserted*." Tenn. R. Evid. 801 (c) (emphasis added). "Hearsay evidence is not admissible except as provided by [the Tennessee Rules of Evidence] or otherwise by law." Tenn. R. Evid. 802.

DCS argues that the petition falls into the "Admission by a Party Opponent" exception, which is "[a] statement offered against a party that is . . . (B) a statement in which the party has manifested an adoption or belief in its truth. . . ." Tenn. R. Evid. 803. DCS contends that Exhibit 23 is an admission by a party opponent because both the Parents stipulated in the January 21, 2014 Dispositional/Adjudicatory Hearing and Order (Exhibit 19) in which both the Parents stipulated that all facts alleged in the petition were true. DCS further contends that the Adjudicatory Order, which includes the Parents' stipulation accepting the facts in the petition as true, also incorporates Exhibit 23 and its alleged facts by reference. Therefore, Exhibit 19/the Adjudicatory Order was admissible, it was never objected to by the Parents, and by reference and stipulation, Exhibit 23 is also admissible. Father, alternatively, argues the petition was both hearsay and does not fall into any of the hearsay exceptions.

In *Dept. of Children's Services v. Whited*, this court held that two permanency

plans containing damning evidence about a mother were not hearsay and were properly admitted pursuant to Rule 803(1.2)(b) as a statement in which the mother "manifested an adoption or belief in its truth" because she had signed both plans. No. M2000-03213-COA-R3-JV, 2001 WL 1386095, at *4 (Tenn. Ct. App. Nov. 8, 2001); *see also State v. Coleman*, No. E2013-01208-CCA-R3-CD, 2014 WL 6908409, at *12 (Tenn. Ct. Crim. App. Dec. 9, 2014) (law enforcement officer's statement about what defendant said during unrecorded interview is not hearsay under (1.2)(b) because defendant initialed each paragraph and signed each page of the statement). Similarly, here, while the Parents did not sign the Adjudicatory Order, they waived their right to a hearing and stipulated that the allegations in the petition were true.

## 2. Relevance/Prejudice/Foundation

DCS argues that the petition is not unfairly prejudicial and has probative value that goes to the root of the issue of the instant case, the Parents' history of drug abuse.

Rule 401 of the Tennessee Rules of Evidence defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "In other words, evidence is relevant if it helps the trier of fact resolve an issue of fact." *Howe v. Howe*, No. E2016-01212-COA-R3-CV, 2017 WL 1324177, at *4 (Tenn. Ct. App. Apr. 10, 2017) (citing Neil P. Cohen, et al., Tennessee Law of Evidence § 4.01[4], at 4-9 (5th ed. 2005)). "Evidence which is not relevant is not admissible." Tenn. R. Evid. 402. If the evidence is relevant, it is admissible unless otherwise excluded by law. *Id.*

Excluding relevant evidence is "an extraordinary step that should be used sparingly." *In re Envy J.*, No. W2015-01197-COA-R3-PT, 2016 WL 5266668, at *10 (Tenn. Ct. App. Sep. 22, 2016) (citations omitted). A trial court may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. This rule requires trial courts to conduct a two-part balancing test. *Howe*, 2017 WL 1324177, at *4 (citing *White*, 21 S.W.3d at 227). First, the trial court must "balance the probative value of the [challenged evidence] against the countervailing factors." *Id.* (citing *White*, 21 S.W.3d at 227). "After the court has engaged in the balancing analysis, it may then exercise its discretion to determine whether the evidence should be excluded if the prejudice substantially outweighs the probative value of the evidence." *Id.* (*White*, 21 S.W.3d at 227). The trial court is in the most suitable position to conduct this balancing test under Rule 403. *Id.*

In *In re Envy J.*, the court held that prior juvenile records, including a petition to adjudicate a mother's other children as dependent and neglected, were admissible and

relevant. 2016 WL 5266668, at *10. The prior juvenile case concerned the mother's history of child abuse and drug usage, and the court held that it was very relevant to the present proceeding where the state was seeking to terminate the mother's parental rights for similar reasons. *Id.*

The trial court clearly did not rely exclusively on the specific evidence at issue in concluding that the parental rights of Mother and Father should be terminated. Even excluding the petition, there was sufficient other evidence in the record to support the trial court's ultimate ruling. Accordingly, the court did not abuse its discretion by admitting the Petition to Transfer Temporary Legal Custody into evidence. Further, in light of the abundance of evidence to support the determination of the trial court, error, if any, was harmless.

### C. Substantial Noncompliance with the Permanency Plan

Father argues that he substantially complied with the requirements of the first two permanency plans by having a suitable home, employment, and undergoing many drug screenings. Both the Parents contend that the new requirements added in the third permanency plan were unrelated to the issues that first caused the foster care placement because the Children have been out of the Parents' custody since 2013 and have been in DCS and foster care since 2015. Father asserts that DCS has not proven that any new circumstances necessitated the new requirements and they are, thus, not reasonable nor related to the original conditions that necessitated the Children's removal. Father further claims that the Parents had made some progress on the new requirements, despite the short three month period between ratification in May and the trial in August.

Mother argues that she had already complied with all requirements reasonably related to remedying the conditions that brought about the Children's removal. She contends that she completed the first and later two plans' requirements requiring employment and turning in a completed A&D assessment (we assume the outdated one from the 2013 case). She further asserts that she complied with all aspects of the second plan that added visitation and drug screening requirements. Mother also claims that she took parenting classes and a mental health assessment when the Children were in DCS custody during the pendency of the Jefferson County case around 2013–2014.

Mother additionally contends that DCS has failed to use reasonable efforts to assist her and to help reunify the Children with the Parents, relying on our decision in *In re Shameel S.*, No. E2014-00294-COA-R3-PT, 2014 WL 4667571, at *3 (Tenn. Ct. App. Sep. 19, 2014). She asserts that once "return to parent" was removed as a goal, the additional requirements added for the Parents in the third permanency plan were no longer reasonable and were related to the sole goal of "adoption."

DCS contends that the Parents were in substantial noncompliance because they clearly and flagrantly failed to complete A&D assessments, frequently tested positive for drugs, and failed to follow treatment protocols as required by all three plans, despite admonitions by DCS workers to do so and the Parents' promises that they would.[7] Most importantly, the Parents failed to complete the requirements most reasonable and closely related to the reason for the Children's removal, the Parents' long history of substance abuse. DCS also points to Mother's failure to complete a mental assessment, the Parents' failure to attend parenting classes except for one class two days before trial, the Parents' noncompliance in being incredibly difficult to contact by DCS workers as required by the third plan, and Father's failure to pay child support under the third plan.

A parent's rights may be terminated for his or her substantial noncompliance with the responsibilities contained in a permanency plan proven by clear and convincing evidence. *In re Valentine*, 79 S.W.3d 539, 546–47 (Tenn. 2002); Tenn. Code Ann. § 36-1-113(g)(2) (2017). Tennessee law requires DCS to develop a plan of care for each foster child. *In re Sophie O.*, No. E2016-01141-COA-R3-PT, 2016 WL 7422782, at *7 (Tenn. Ct. App. Dec. 23, 2016). A permanency plan's requirements first must be reasonable and related to remedying the conditions which necessitated foster care replacement. *In re Yariel S.*, 2017 WL 65469, at *7 (quoting *In re Valentine*, 79 S.W.3d at 547). Our Supreme Court has consistently held the same. *In re Carrington*, 483 S.W.3d 507, 537 (Tenn. 2016) (plan requirements must be "reasonable and related to remedying the conditions which necessitate[d] foster care placement") (citations omitted); *In re Valentine*, 79 S.W.3d at 547 (citing Tenn. Code Ann. §§ 37-2-403(a)(2)(C); 36-1-113(g)(2) (2017)). "Conditions necessitating foster care placement may include conditions related both to the child's removal and to family reunification." *In re Valentine*, 79 S.W.3d at 547.

Second, DCS must show the noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. *In re Valentine*, 79 S.W.3d at 548–49. Mere "noncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial." *Id.* "Black's Law Dictionary defines 'substantial' as 'of real worth and importance.'" *Id.* (citing Black's Law Dictionary 1428 (6th ed. 1990)). "Terms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant." *Id.* "Determining whether a parent has substantially complied with a permanency plan involves more than merely counting up the tasks in the plan to determine whether a certain number have been completed and 'going through the motions' does not constitute substantial compliance." *In re Carrington H.*, 483 S.W.3d at 537 (citing *Valentine*, 79 S.W.3d at 547).

---

[7] DCS does note that Father completed an A&D assessment, but he did not follow through with treatment.

Parents who have had their children removed because of drug abuse have been found to be in substantial noncompliance primarily because of failure to follow plan requirements related to that abuse, such as failing to complete an A&D assessment and subsequent treatment and for refusing or failing drug screens. *E.g.*, *In re Yariel S.*, 2017 WL 65469, at *7; *In re Kayla B.*, No. E2016-01192-COA-R3-PT, 2017 WL 65469, at *8 (Tenn. Ct. App. Feb. 1, 2017); *In re Destiny S.*, No. M2016-00098-COA-R3-PT, 2016 WL 4186731, at *8 (Tenn. Ct. App. Aug. 4, 2016).

The court properly concluded that the Parents had neglected to complete the reasonable requirements most closely related to the reason for the Children's removal-substance abuse. Accordingly, the court correctly determined that the Parents failed to substantially comply with the reasonable requirements of the permanency plans. The trial court noted: "There has been substantial noncompliance with the parenting plans. What concerns the court is that the [C]hildren have been away from the [P]arents for about three years. [The Parents] have shown little interest in getting the [C]hildren back. It is an easy thing to go and do the assessments that they have been told to do. They were told three times to do that . . . . These things could have been done if the parents were serious about getting the [C]hildren. . . ."

Contrary to Mother's reliance on our decision in *In re Shameel S.*, 2014 WL 4667571, at *3, our Supreme Court recently ruled definitively that "nothing in the plain language of section 36-1-113 indicates that a petitioner in a proceeding to terminate parental rights is in fact required to put on proof of DCS' reasonable efforts to assist the respondent parent." *In re Kaliyah S.*, 455 S.W.3d 533, 554 (Tenn. 2015). Rather, the language of the statute indicates only that the trial court is to consider DCS' reasonable efforts, or the lack thereof, in determining whether termination of the parent's rights is in the child's best interest." *Id.* In essence, DCS' effort to assist the respondent parent is not a separate element that must be proven beyond the elements of grounds and the child's best interest. *Id.*

We conclude that the facts, as found by the trial court, clearly and convincingly establish the elements necessary to terminate the Parents' parental rights on the ground of substantial noncompliance with the permanency plans.

### D. Best Interest Analysis.

Having concluded that there was clear and convincing evidence supporting at least one statutory ground to terminate the Parents' parental rights, consideration must be given to whether termination was in the best interest of the Children. In making this determination, courts are guided by the following non-exhaustive list of factors:

(i) In determining whether termination of parental or

guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36-5-101.

Tenn. Code Ann. § 36-1-113(i).

"This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re Yariel S.*, 2017 WL 65469, at *9 (quoting *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005)). According to the General Assembly's mandate, "when the best interests of the child[ren] and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child[ren], which interests are hereby recognized as constitutionally protected." *In re Yariel S.*, 2017 WL 65469, at *9 (quoting Tenn. Code Ann. § 36-1-101(d)); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

The Parents have not had custody of the Children since October 2013. The Children have been in the care of foster parents since September 2015. The record, including the foster mother's testimony, clearly reflects that the Children are flourishing in their new home environment with their foster parents, whom they call "mommy and daddy."

The trial court observed that the Parents "continue to use drugs and make no real effort to discontinue their use." The court determined that the Parents had not "made an adjustment to the circumstances or the conditions to make it safe for the [C]hildren."

Father argues that the trial court erred in finding that the Children have "no memory" of time with the Parents and thus no "meaningful relationship" between them under factor (4). Father contends that the record clearly reflects that visitations went well, the Children were "happy to see their parents" at visits, and the Children "enjoyed playing with their parents" at court hearings and foster care review boards. Father further asserts that the trial court mentioned several times in its ruling that a meaningful relationship existed between the Parents and the Children.

Mother argues that the record is devoid of evidence to support the trial court's findings against the Parents under factors (1), (4), (5), (7), and (9). Further, Mother contends that trial courts are not limited to those factors. She asserts that the Parents are of limited financial means while noting that the foster parents receive $1732 in monthly subsidies. Mother argues that the Parents' lives and, thus, the Children's lives would improve dramatically if the Parents received a similar financial boon. Further, she points to the record reflecting that the Children have their own room in the Parents' home and various characteristics about the home that make it suitable for the Children.

DCS argues that termination of parental rights was in the Children's best interest

because the Parents have not made significant adjustments to their conduct owing to repeated drug screening failures and failure to seek treatment; DCS made frequent attempts to stay in contact with the Parents and to make them aware of the plans, the plans' requirements, and services available through DCS; the Parents failed to maintain contact with DCS' caseworkers and misled them about their progress with the plans' requirements; the Parents have no meaningful relationship with the Children because the Children have been in foster or DCS custody since they were one and two years old, respectively; the Parents have only visited the Children inconsistently; and the Children are flourishing and are "very attached" in their foster home, they call their foster parents "mommy and daddy," and the foster parents intend to adopt them.

Based on the totality of the evidence before us, we agree with the trial court that there is clear and convincing evidence that termination of the parental rights of the Parents was in the best interest of the Children, who have been in DCS custody for several years while the Parents have failed to meet the requirements of their plans and improve their circumstances. The Children should be allowed to continue to thrive in their placement with the foster parents with whom they have bonded and who would like to adopt them.

## V. CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for enforcement of the trial court's judgment. Costs of the appeal are assessed to the appellants, Nancy M. and Aaron T.

_____
JOHN W. MCCLARTY, JUDGE

- 21 -